## LANGE v. MAYO.

### Opinion delivered April 11, 1927.

1. EXCHANGE OF PROPERTY—DISCREPANCY IN CULTIVATED ACREAGE.—Under a contract for exchange of a farm for city property, a discrepancy of 125 acres in the cultivated load from that represented was a material one.

2. EXCHANGE OF PROPERTY—FALSE REPRESENTATIONS.—False representations as to acreage of cultivated land, though material in a contract for exchange of lands, are not sufficient grounds for avoiding the exchange, or to prevent specific performance of the contract.

3. SPECIFIC PERFORMANCE—FALSE REPRESENTATIONS.—Though, in a suit to enforce specific performance of a contract for exchange of lands, plaintiff made false representations as to the acreage of cultivated land, specific performance will not be denied, where defendant examined the property carefully and was aware of the discrepancy as to acreage before entering into the contract.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; affirmed.

*Will G. Akers,* for appellant.

*Coleman & Riddick,* for appellee.

HUMPHREYS, J. This suit was instituted by appellees against appellants in the chancery court of Pulaski County, to enforce the specific performance of a contract for the exchange of their farm in Lonoke County, Arkansas, for an apartment house belonging to appellant in Capitol View Addition to the city of Little Rock, Arkansas.

Appellants interposed the defense that they were induced to enter into the contract through the false and fraudulent representation of appellees that 500 acres of the land were in a high state of cultivation, and, on account of the alleged misrepresentation, sought by cross-bill to cancel the contract.

The cause was submitted to the court upon the pleadings and testimony adduced by the respective parties, which resulted in a finding that appellees were entitled to a specific performance of the contract, and decreed accordingly, from which is this appeal.

In October, 1925, appellees advertised the farm for sale or exchange, describing it, as to acreage, as comprising 594 acres of land, 500 acres of which were in cultivation. David C. Lange, one of the appellants, answered the advertisement by letter with a view to exchanging his apartment house for the land. Appellees replied by letter, particularly describing the farm and stating that there were 500 acres in a high state of cultivation. David C. Lange made no response to the letter. Later R. W. Mayo called upon him and offered to show him the farm. Lange accepted the invitation, and they visited it and went all over the farm on Sunday, November 1. While there, Lange asked Mayo as to the acreage in cultivation. According to the testimony of Lange, Mayo said 500 acres. According to the testimony of Mayo, he made the following reply to the question: "Mr. Lange, I do not know just how many acres of it are in cultivation, but we bought the place for 594 acres, 514 in cultivation. I think there is approximately 500 acres in cultivation." The parties were unable to agree upon a trade, so the deal was stopped. On November 4 Lange wrote to Mayo as follows: "I was sorry that we could not get together on a trading proposition, but thought you might be interested in the cash proposition I made of $15,000 for my equity." After receiving this letter, appellees concluded they could trade the apartment house for a rice farm, so negotiations were resumed. R. W. Mayo testified that, in the course of the negotiations, he said: "Mr. Lange, I told you about this trade. Now, I tell you what to do. I want you to be thoroughly satisfied in what you are doing. You go down to the farm—go down in Lonoke County, talk to the different tenants that are on the farm, the different neighbors, find out what cotton they are making, and about the value of different lands around there, and, when you are thoroughly satisfied, come back and make me a proposition, and I think I can handle it." This statement was not contradicted by Lange.

According to the testimony of A. C. Brummitt, Lange came with W. D. Mayo the first Sunday in November and looked over the farm; and came alone the three following Sundays, the 8th, the 15th, and the 22d, arriving each time at about 11 o'clock A. M. and leaving late in the afternoon, after looking over and inspecting the farm. The witness stated that the first two Sundays he met and became acquainted with Lange, but had no conversation with him concerning the farm; that, on the third Sunday, the 15th of November, he had a conversation with Lange relative to renting the farm if he purchased same; that he offered to pay him $6 per acre for the land he was cultivating; that Lange was not pleased with the offer, stating that he could not make 6 per cent. on the investment at that price, as he had been told by N. A. Marshall, another tenant on the place, that there weren't more than 375 acres in cultivation. Lange then proposed that, if he got the land, to let witness have it for one-fourth of the crop on the cotton land, $6 an acre on the corn land, and $8 an acre on the land planted to other crops. Witness refused this proposition, and they came to no agreement.

According to the testimony of N. A. Marshall, Lange asked him how many acres there were on the farm in cultivation, and that he told him about 375 acres inside the fence lines.

Lange admitted having the conversations with Brummitt and Marshall relative to the acreage of cultivated lands in the tract, but claimed they were subsequent to the execution of the contract, which was signed by the parties on the 18th day of November. He stated that he received his first information as to the shortage of cultivated lands in the tract from Marshall, and that, after making further investigation and ascertaining that Marshall's statement was about correct, he declined to proceed further with the contract. He also stated that he signed the contract in reliance upon Mayo's representation that the tract contained 500 acres of cultivated land, and would not have signed it unless he had believed

that there was that much land in cultivation. After the parties came to an understanding relative to the terms of the exchange of lands, they consulted their respective attorneys and had them prepare the contract. No reference was made in the contract to the amount of cultivated land in the tract.

Appellees employed ———— Smith to survey out the cultivated lands, and, according to his survey, there were 468 acres of cleared land in the tract, including 30 acres of buckshot land used as pasture.

Lange employed J. O. Jones to survey out the cultivated lands, and, according to his survey, excluding the pasture, the tract contained 385 acres of land actually in cultivation.

Other witnesses who were familiar with the lands testified as to the amount of lands actually in cultivation on the tract, who varied in their estimates from 350 to 450 acres.

We are convinced, after a careful reading of the record in the case, that appellees misrepresented the amount of lands in cultivation on the tract in the advertisement for the sale and exchange of the land, in the letter they wrote in response to Lange's letter of inquiry, and in their conversations and consultations with him prior to the time the deal was stopped. After negotiations were resumed, however, appellees requested Lange to make a thorough investigation of the farm by going upon it, talking to the tenants and neighbors around about, and, after satisfying himself, to make them a proposition. Lange made a rather thorough investigation of the farm, and, according to the testimony of two witnesses, became aware of the discrepancy in the acreage of cultivated lands on the tract three days before he entered into the contract for the exchange of the properties. The shortage in acreage in cultivated lands was about 125 acres, and a material discrepancy. False and fraudulent misrepresentations as to the acreage, which is material, in a land deal, unless relied upon, are not sufficient grounds to avoid a sale or trade or to prevent the

specific performance of the contract. In view of the inspection of the farm made by Lange, the request of appellees for him to make his own investigation, and the testimony of Brummitt and Marshall, it cannot be said that the finding of the chancellor, to the effect that the discrepancy in the acreage of cultivated lands did not induce the trade, is contrary to a clear preponderance of the evidence. With the opportunity afforded Lange to investigate and inspect the farm, it must be presumed that he exercised and relied upon his own judgment in making the contract. We think the rule announced by this court in the case of *Carwell* v. *Dennis,* 101 Ark. 608, 143 S. W. 137, is applicable to the facts in the instant case. The rule referred to is as follows:

"A misrepresentation, in order to affect the validity of a contract, must relate to some matter of inducement to the making of the contract, in which, from the relative position of the parties and their means of information, the one must necessarily be presumed to contract upon the faith and trust which he reposes in the representations of the subject of the contract. For, if the means of information are alike accessible to both, so that, with ordinary prudence or diligence, the parties might respectively rely upon their own judgment, they must be presumed to have done so. Or, if they have not so informed themselves, must abide by the consequences of their own inattention and carelessness."

No error appearing, the decree is affirmed.